1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK THOMASON, an individual,<br><br>          Plaintiff,<br><br>    vs.<br><br>CITY OF FOWLER, FOWLER CITY MANAGER DAVID ELIAS, an individual, POLICE CHIEF MICHAEL BRAND, an individual, and TEN UNKNOWN NAMED EMPLOYEES OF THE CITY OF FOWLER,<br><br>          Defendants. | **1:13-cv-0336 AWI BAM**<br><br>**AMENDED MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST FOURTH FIFTH AND/OR SIXTH CLAIMS FOR RELIEF**<br><br>**Doc. # 22** |

This is an action for damages arising from the termination of plaintiff Derek Thomason ("Plaintiff") from his employment with defendant City of Fowler ("City") by individual defendants City Manager David Elias ("Elias") and Police Chief Michael Brand ("Brand," collectively "Defendants"). Plaintiff's First Amended Complaint ("FAC") alleges claims for violation of Plaintiff's free speech rights under the First Amendment in violation of 42 U.S.C. § 1983, and state law claims for violation of various statutes set forth in the California Labor Code and for intentional infliction of emotional distress ("IIED") and wrongful termination in violation of public policy under California common law. Currently before the court is Defendants' motion to dismiss Plaintiff's sole federal claim pursuant to section 1983 and Plaintiff's IIED claim. Defendants also seek to dismiss Plaintiff claim for wrongful termination in violation of public policy and/or the claim under the Private Attorney General Act, Labor

Code § 2698 et seq.  Federal subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.
Venue is proper in this court.

### FACTUAL BACKGROUND AND PRODCEDURAL HISTORY

The original complaint in this action was filed in this court on March 8, 2013.  The currently-operative FAC was filed on April 22, 2013.   For purposes of analysis of Defendants' motion to dismiss, the relevant factual background alleged in the FAC centers around two issues; Plaintiff's employment status during the time he worked for the Fowler Police Department and the nature of certain communications that took place between Plaintiff and certain non-police individuals and entities during the time prior to Plaintiff's alleged termination on or about February 29, 2012.  The following facts are alleged in Plaintiff's FAC.

Plaintiff began employment with the Fowler Police Department in 2009 as a civilian "support services manager."  At the time of his employment, it was understood between Plaintiff and then Police Chief, Darrel Jamgochian ("Jamgochian") that Plaintiff would be appointed to the position of Police Lieutenant after a relatively brief time during which Plaintiff's application for the position of Police Lieutenant would be processed and a background check would be completed.  During the time of his employment Plaintiff alleges he had a number of responsibilities that corresponded to those of a police lieutenant including coordination of the target range and training programs, internal affairs reviews, overseeing of office functions and investigations and other duties as assigned by Jamgochian.  During his three-year tenure, Plaintiff was never sworn as a Police Lieutenant or paid salary and benefits commensurate with such an appointment.

Plaintiff's FAC alleges that as early as 2005, it was discovered that a significant backlog of police reports was accumulating in Jamgochian's office.  Jamgochian was ordered by City manager Elias to "'clean up" the backlog of unfiled cases and to delegate his responsibilities to appropriate staff members.  Jamgochian did not subsequently file the criminal complaints and did not delegate this task."  Doc. # 22 at ¶ 20.  Plaintiff alleges that Elias "failed to ensure that Jamgochian complied" with the order to clean up the backlog.  Id. at ¶ 21.  In the fall of 2010 Elias asked Plaintiff about the "case filings in the Lieutenant's Office."  Id. at ¶ 26.  Apparently,

the "Lieutenant's Office" was a locked, unoccupied office space to which only Jamgochian and Elias had keys.  Elias produced a key to the Lieutenant's Office and he and Plaintiff noted "criminal case files all over the floor and furniture."  Id. at ¶ 26.  The date of the recovery of police reports from the "Lieutenant's Office" is not specified in the FAC, but the court infers the recovery of the files occurred sometime before October 27, 2010, because that is the date give by Plaintiff to mark the beginning of the time he began processing the first batch of fifty-seven cases that were submitted on November 3, 2010, to the District Attorney for prosecution.  Jamgochian was subsequently placed on administrative and Russsell Snow ("Snow") was put in the position of Acting Police Chief.  Later, on or about November 9, 2010, again using Elias' key, Snow and Elias entered Jamgochian's locked office[1] where they "saw hundreds of unfiled criminal cases, internal affairs files, officer's psychological and medical reports and other confidential and sensitive documents all over the floor and furniture."  Doc. # 20 at ¶ 29.  Approximately 600 unprocessed criminal reports were recovered from Jamgochian's office from which about 200 were prepared for filing with the District Attorney by Plaintiff and another employee.  Many of the 600 reports concerned criminal activity on which the applicable statute of limitations had run.

Of particular importance to Defendant's motion to dismiss, the FAC alleges that between early November 2010 and Jamgochian's resignation on January 4, 2011, Plaintiff undertook a number of communications between himself and persons or entities that were not a part of the Fowler Police Department.  Those communications can be summarized as follows:

1. Sometime in "early November 2010" but prior to November 4, 2010, Plaintiff met in a coffee shop with Fowler City Councilman Rick Darling.  The meeting was at Plaintiff's request and on Plaintiff's own time.  The purpose of the meeting was to discuss "the corruption [Plaintiff] had witnessed at the [Fowler Police Department]."  Plaintiff and Darling decided to present the matter to the Fresno County Grand Jury.

---

[1] Although not explicitly stated in the FAC, the court infers that Jamgochian's office remained unoccupied during the time Snow was functioning as interim Chief of Police.

2.  On November 4, 2010, Plaintiff completed and filed a Citizen's Report to the Fresno County Grand Jury by way of Darling.  The report detailed Jamgochian's mishandling of Police crime reports.

3.  On November 21, 2010, Plaintiff sent a letter to the Grand Jury Foreman, Mr. Coburn, to update information submitted in the complaint with recent information regarding the hundreds of files recovered from Jamgochian's office and their status.

4.  A second update letter was sent by Plaintiff to Coburn on December 1, 2010.

5.  Between the end of December 2010 and the beginning of January 2011, Plaintiff presented testimony before the Fresno County Grand Jury.  Plaintiff emphasizes that his presence was not compelled by subpoena and that he testified on his own time as a private citizen.

The Fowler City Council accepted Jamgochian's resignation on January 4, 2011.  The Fresno County Grand Jury issued a final report in response to Plaintiff's complaint on or about May 18, 2011.  Plaintiff alleges the final report criticized the "lack of concern by Defendant City leaders to ensure the well-being and safety of their community."  Doc. # 20 at ¶ 41.  After Jamgochian's resignation, Plaintiff made a final communication by briefly addressing the Fowler City Council at a "special council meeting to approve the City of Fowler's consolidated response to the Fresno County Grand Jury Final Report."  Again, Plaintiff emphasizes that City Council meeting occurred after Plaintiff's work hours and that Plaintiff was not compensated for the time he spent at the meeting.

Of significance to Plaintiff's claim that he suffered retaliation in violation of his First Amendment rights, Plaintiff alleges that earlier in the same day as Plaintiff gave his brief presentation to the City Council, he was approached by Elias regarding the status of Plaintiff's POST certification.  Plaintiff inferred from the conversation that Elias planned to hire Plaintiff as a lieutenant soon.  Following Plaintiff's brief presentation to the City Council, Show informed Plaintiff that Elias was angry, presumably because the Grand Jury report cast Elias in a negative light.  On June 3, 2011, in a letter in response to an inquiry by Plaintiff about making the transition to lieutenant, Elias informed Plaintiff that Plaintiff had been hired "as a part-time

temporary Support Services Manager."  Plaintiff had never been told that the position was part time or temporary.

On or about October 21, 2011, interim Chief Snow separated from employment from the Fowler Police Department.  Three Days later Defendant Brand assumed the office of Chief of Police.  The remainder of the factual background presented in the FAC sets forth a sequence of communications between Plaintiff and Defendants Brand and Elias.  The upshot of these communications was that the scope of Plaintiff's duties were reduced to the processing of the backlog of criminal complaints and that the position of Elias and Brand with regard to Plaintiff's employment status was that Plaintiff's position was both temporary and part time and that funding for the position would be discontinued once the backlog of criminal complaints was cleared away.  Under Brand, Plaintiff's employment was categorized as part time which meant that Plaintiff did not receive health or other insurance benefits.

On or about May 30, 2011, Plaintiff filed a complaint with the Fowler Grand Jury[2] which detailed Plaintiff's allegations of corrupt practices by Elias including granting contracts to friends in violation of the city's bidding procedures.  Plaintiff alleges that he was informed by Brand, in the course of a casual discussion that occurred on February 3, 2012, that the lieutenant's position had been eliminated subsequent to the reclassification of three corporals to the rank of sergeant which non-typically reduced the ratio of supervisor to supervisee to 1:1.  Plaintiff alleges that the decision to reclassify three corporals to sergeants was made following Plaintiff's exposure of "Jamgochian's and Elias' corrupt practices to the City council and Grand Jury as part of [Elias'] pre-textual scheme to terminate [Plaintiff's] employment."  Doc. # 20 at 11:21-23.  Plaintiff alleges that on February 2, 2012, he received an inter-office memorandum from Brand informing Plaintiff that his position would be eliminated as of February 29, 2012.

_____

[2]    Pursuant to California Penal Code, section 888, the authority to form a grand jury resides with the counties, not the cities.  Plaintiff's reference to the "Fowler Grand Jury" is therefore puzzling.  For purposes of the present discussion, a clarification of the title and function of the grand jury to which Plaintiff addressed his second complaint is not necessary.  At some point in the future, however, clarification may be beneficial.

Defendants' motion to dismiss Plaintiff's first, fourth fifth, and/or sixth claims for relief

was filed on May 10, 2013, Plaintiff's opposition was filed on June 3, 2013, and Defendant's

reply was filed on June 10, 2013.  On August 22, 2013, Plaintiff' filed a notice of intervening

authority, noting the recent filing of a case by the Ninth Circuit Court of Appeals overruling

Huppert v. City of Pittsburg, 574 F.3d 696 ( 9th Cir. 2009).  Defendants filed a response to

Plaintiff's notice of intervening authority on August 23, 2013.

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

can be based on the failure to allege a cognizable legal theory or the failure to allege sufficient

facts under a cognizable legal theory.  Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530,

533-34 (9th Cir.1984).  To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint

must set forth factual allegations sufficient "to raise a right to relief above the speculative level."

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Twombly").  While a court

considering a motion to dismiss must accept as true the allegations of the complaint in question,

Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976), and must construe the

pleading in the light most favorable to the party opposing the motion, and resolve factual

disputes in the pleader's favor, Jenkins v. McKeithen, 395 U.S. 411, 421, reh'g denied, 396 U.S.

869 (1969), the allegations must be factual in nature.  See Twombly, 550 U.S. at 555 ("a

plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do").  The pleading standard set by Rule 8 of the Federal Rules of Civil Procedure "does not

require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) ("Iqbal").

The Ninth Circuit follows the methodological approach set forth in Iqbal for the

assessment of a plaintiff's complaint:

> "[A] court considering a motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than conclusions, are not entitled to the
> assumption of truth.  While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.  When there are well-

1
2
       pleaded factual allegations, a court should assume their veracity and then
       determine whether they plausibly give rise to an entitlement to relief."

3
Moss v. U.S. Secret Service, 572 F.3d 962, 970 (9th Cir. 2009) (quoting Iqbal, 129 S.Ct. at

4
1950).

5
**DISCUSSION**

6
**I.    Plaintiff's First Claim for Violation of First Amendment Rights\**

7
      Plaintiff's first claim for relief alleges he was subject an adverse employment action in

8
retaliation for his report of the misdeeds of Jamgochian and Elias to the Fresno County Grand

9
Jury and to the Fowler City Council in violation of his rights under the First Amendment.

10
Defendants' motion to dismiss relies entirely on the Ninth Circuit's now-reversed holding in

11
Huppert. Defendants, recognizing the effect of the overruling of Huppert on their argument,

12
suggest that the court permit Defendants to re-plead their grounds for dismissal of Plaintiff's first

13
claim for relief in order to allege a defense of qualified immunity as to the two individual

14
Defendants.

15
      In Garcetti v. Ceballos, 547 U.S. 410 (2006) the Supreme Court held recognized that "the

16
First Amendment protects a public employee's right, in certain circumstances, to speak as a

17
citizen addressing matters of public concern.," id. at 417, but that the public employee must be

18
speaking as a private citizen to be afforded constitutional protection. See id. at 421-422

19
("Restricting speech that owes its existence to a public employee's professional responsibilities

20
does not infringe any liberties the employee might have enjoyed as a private citizen"). In a

21
decision filed in January 2009, the Ninth Circuit distilled elements of a claim for First

22
Amendment retaliation in the context of a public employee as follows: (1) the speech in question

23
must be on a matter of public concern; (2) the employee spoke as a private citizen; (3) the

24
protected speech was a substantial or motivating in the adverse employment action; the

25
governmental employer did not have an adequate reason for treating the employee differently

26
from other members of the general public; and (5) the governmental employer would not have

27
taken the adverse action absent the protected speech. Eng v. Cooley, 552 F.3d 1062, 1069 (9

28
Cir. 2009).

1    The Ninth Circuit's opinion in Huppert was filed in July of the same year as the decision

2    in Eng and confronted the question of the scope of a police officer's official duties in reporting

3    the malfeasance of governmental officials.  In making that decision, the Huppert court  relied on

4    a very broad description of police duties set forth in Cristal v. Police Comm'n of City & County

5    of San Francisco, 33 Cal.App.2d 564 (1939).  See Huppert, 574 F. 3d at 707.  In Dahlia v.

6    Rogriguez, --- F.3d ----, No. 10-55978, 2013 WL 4437594 (9th Cir. August 21, 2013), the Ninth

7    Circuit, in an en banc decision, reversed the decision in Huppert "to the extent that it improperly

8    relied on a generic job description [from Cristal] and failed to conduct the 'practical,' fact-

9    specific inquiry required by [Garcetti v. Ceballos, 547 U.S. 410 (2006)]."  Dahlia, No. 10-55978

10   at 21.  To a significant extent, Defendant's argument for dismissal of Plaintiff's first claim for

11   relief relies on the now-rejected proposition in Huppert that certain duties of police officers to

12   report malfeasance could be assumed to be a part of the officer's duties obviating the need for a

13   fact-based examination.  Thus, Defendants recognize, and the court agrees, that Defendants'

14   motion to dismiss Plaintiff's first claim for relief is substantially undercut by the decision in

15   Dahlia.

16       Both the majority opinion in Dahlia and the concurring opinion by Justices O'Scannlain

17   and Kozinski underscore that the major effect of the majority decision is to firmly establish the

18   proposition that the determination of whether the speech of a public employees is that of a

19   private citizen or a public employee is an issue of fact or, at minimum , an issue of mixed law

20   and fact which is often not amenable to decision on a preliminary record.  See Dahlia, No. 10-

21   55978 at 25 n.12 (adhering to view that it is often inappropriate to take from the finder of fact

22   the determination of scope of a public employee's duties ); id. at 56 (decision of majority

23   forecloses preliminary challenge based on categorical understanding of duties of a police

24   officer).

25       Even if Plaintiff was a sworn police officer at the time of his communications with city

26   officials or grand juries, the Decision in Dahlia would require a fact-based examination of the

27   scope of Plaintiff's duties.  Given that Plaintiff was never sworn as a police officer, the question

28   of whether he was he was expected  in his "civilian" capacity to bring concerns of official

malfeasance to anyone's attention is not something the court can even begin to address on anything less than a full record.  The court is of the opinion that there it would be premature to address the issue of qualified immunity in this case without the benefit of information that would become available, if at all, only through discovery.  The court will therefore deny Defendants' motion to dismiss Plaintiff's first claim for relief without leave to re-plead with the expectation the issue will be addressed following discovery.

## II.   Motion to Dismiss Fourth Claim for Relief

Plaintiff's fourth claim for relief alleges intentional infliction of emotional distress ("IIED") under California common law against all defendants.  Briefly, Defendants contend that the City of Fowler is immune from common law claims under California Government Code § 815 and that the individual Defendants are similarly immune because they were sued in their official capacities.  See McMillian v. Monroe County, Ala., 520 U.S. 781, 785 n.2 (suit against public official in his official capacity is essentially a suit against the public entity the official represents).  Plaintiff does not address Defendants contention that the individual Defendants are being sued in their official capacities.  Rather Plaintiff contends that a public entity is liable for torts committed by its individual employees during the course and scope of their employment.  The court has reviewed Plaintiff's FAC and finds that it is ambiguous whether Defendants are being sued in their individual or official capacities or both.  In any event, if it were the case that Defendants were being sued in their official capacities, the claim would be curable simply by amendment of the complaint.

The court is of the opinion that it is a better use of judicial resources at this point to address the sufficiency of Plaintiff's fourth claim for relief on the merits rather than on the grounds of immunity.  A claim for IIED arises when there is "outrageous conduct by the defendant" proximately causing emotional distress.  Agarwal v. Johnson, 25 Cal.3d 932, 946 (1979).  The conduct in question must be "more than mere insult, indignities, threats, annoyances, petty oppressions, or other trivialities."  Iverson v. Atlas Pacific Engineering, 143 Cal.App.3d 219, 231 (1st Dist. 1983).  Of paramount importance to this action "[m]anaging personnel is not outrageous conduct beyond the bounds of human decency, but rather conduct

essential to the welfare and prosperity of society." <u>Janken v. GM Hughes Electronics</u>, 46 Cal.App.4th 55, 80 (1996). Thus, actions that are within the realm of ordinary personnel actions by an employer -- such as hiring, firing, setting duties and priorities – are insufficient to support a claim of IIED even when those decisions are motivated by improper considerations such as retaliation or discrimination. <u>Id.</u>

The court has carefully reviewed the factual basis of Plaintiff's FAC and finds that all of the actions alleged against Defendants were actions well within the realm of personnel management. Those actions included redirecting Plaintiff's priorities, narrowing the scope of Plaintiff's duties, determining the conditions of Plaintiff's employment and, ultimately defunding Plaintiff's position. While those actions may well have been taken for impermissible retaliatory reasons, they are nonetheless the sorts of actions normally within the realm of personnel management decision making and therefore will not support a claim for IIED under <u>Janken</u>. Plaintiff's fourth claim for relief will therefore be dismissed with prejudice.

**III. Motion to Dismiss Fifth Claim for Wrongful Termination in Violation of Policy**

Plaintiff's fifth claim for relief alleges wrongful termination in violation of public policy against the City of Fowler only. Defendants contend that Plaintiff's fifth claim for relief alleges a common law claim for relief against a public entity; a claim that is prohibited by Government code section 815. Plaintiff opposes Defendants' motion by contending that the claim is authorized by Government Code section 815.6, which renders a public entity liable where the entity is under "a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular injury" and where the failure to discharge the duty proximately causes the injury.

Plaintiff's argument is unavailing. The immunity of Public entities to common law claims for wrongful discharge in violation of public policy is well established. <u>See, e.g.,</u> <u>Miklosy v. Regents of the University of California</u>, 44 Cal.4th 876, 900 (2008); <u>Palmer v. Regents of the University of California</u>, 107 Cal.App. 4th 899 (2003). "[T]o come within section 815.6 on a claim of damages liability, the enactment at issue, in its direction to the public entity, must require (not merely authorize or permit) that *a particular action* be taken or not

taken." <u>Mueller v. County of Los Angeles</u>, 176 Cal.App.4th 809, 818 (2nd Dist. 2009) (italics added).  Plaintiff contends that California's "Whistle-blower" statute, Labor Code section 1102.5, creates a mandatory duty on the part of public entities to not retaliate against an employee for the reporting of what the employee reasonably believes to be a violation of state or federal statute.  Plaintiff's argument fails because retaliation is not a *particular action* that is to be taken or not taken.  Retaliation is a legal conclusion based upon the taking or not taking of discretionary managerial actions for reasons that are not permissible.  As long as the actions themselves are discretionary in nature, section 815.6 does not apply.  <u>Id.</u>  The court concludes Plaintiff's fifth claim for relief is barred by Government Code section 815 and will therefore be dismissed with prejudice.

**IV.    Motion to Dismiss Plaintiff's Sixth Claim Under Private Attorney General Statute**

Plaintiff's sixth claim for relief seeks penalties against defendants under California's Labor Code Private Attorneys General Act of 2004; Labor Code § 2698 et seq,  Pursuant to Labor code § 2699.3, an aggrieved employee may commence a civil action under any of the labor code sections enumerated in section 2699.5 once the aggrieved employee has; (1) given "written notice by certified mail to the Labor and Workforce Development Agency and the employer of the *specific provisions* of this code alleged to have been violated including the facts and theories to support the alleged violation."  Cal. Labor Code § 2699.3(a)(1).  Defendants contend that Plaintiff has failed to state a claim under section 2699.3 because he did not alleged facts to show he complied with the preliminary requirements to commence a civil action under the statute because he did not allege the specific labor code or codes that were violated.  The court has examined the letter from Plaintiff's counsel to Defendants and agrees that the letter does not specify the labor code or codes that are alleged to have been violated.  <u>See</u> Doc. # 20-3 (Exhibit "C" to Plaintiff's FAC).

Significantly, Plaintiff does not argue that he did provide notice of the specific labor codes that are alleged to have been violated; he simply contends that the requirement for notice of the specific labor codes alleged to have been violated does not exist.  The court has carefully reviewed the statutory language and must disagree with Plaintiff's contention.  Section 2699.3(a)

very clearly states that it sets forth the requirements for the commencement of a civil action under section 2699, and section 2699.3(a)(1) and that notice to the employer of the specific labor codes alleged to have been violated is required.  The court has no reason to conclude that section 2699.3(a)(1) means anything other than precisely what it says.  Notice to the employer of the specific labor codes that are alleged to have been violated is a necessary prerequisite to the commencement of a civil action under section 2699.  The documents attached as exhibits to Plaintiff's FAC do not establish that Defendants were provided with notice of the specific labor code that are alleged to have been violated and Plaintiff does not argue that notice was otherwise provided.  The court must therefore conclude that Plaintiff has failed to allege facts to that would permit the court to grant relief as to Plaintiff's sixth claim for relief.

THEREFORE, in accord with the foregoing discussion, it is hereby ORDERED that:

1.      Defendants' Motion to dismiss Plaintiff's first claim for relief is DENIED.  Defendants' request to re-plead their motion to dismiss on grounds of qualified immunity is DENIED.

2.      Defendant's motions to dismiss Plaintiff's fourth, fifth and sixth claims for relief are GRANTED.  Plaintiff's fourth, fifth and sixth claims for relief are hereby DISMISSED with prejudice.


IT IS SO ORDERED.

Dated:   September 5, 2013       _____
                                            SENIOR  DISTRICT  JUDGE